4

THE STATE, EX REL. SCHWARTZ ET AL., *v.* BROWN,
SECRETARY OF STATE.

[Cite as State, ex rel. Schwartz, v. Brown (1972),
32 Ohio St. 2d 4.]

(No. 72-749—Decided October 20, 1972.)

6

*Messrs. Vorys, Sater, Seymour & Pease, Mr. Herbert R. Brown, Mr. Jacob Davis, II,* and *Mr. David S. Cupps,* for relators.

*Mr. William J. Brown,* attorney general, and *Mr. Thomas V. Martin,* for respondent.

LEACH, J. At the outset, it should be noted that respondent concedes that the proposed amendment of Section 8, Article XII of the Ohio Constitution, if approved by the electorate, will become effective on December 8, 1972, and not on January 1, 1973. Independently of this concession, such a conclusion is compelled by the specific language of Section 1b, Article II of the Ohio Constitution which provides that:

"Any proposed * * * amendment to the Constitution submitted to the electors as provided in [section] 1a and 1b, if approved by a majority of the electors voting thereon, shall take effect thirty days after the election at which it was approved * * *." See, also, *State, ex rel. McNamara,* v. *Campbell* (1916), 94 Ohio St. 403, and *Euclid* v. *Heaton* (1968), 15 Ohio St. 2d 65.

Thus, so far as its effective date be concerned, it now appears that the reference to an effective date of January 1, 1973, in the summary was not correct.

One of relators' contentions appears to be that the present proposal, being effective at a different date than the date specifically contained in the original proposal submitted to the Attorney General and filed with the Secretary of State, as provided by R. C. 3519.01, cannot qualify for voter approval or rejection, even though it complies with all *constitutional* requirements mandating its placement on the ballot.

By the terms of Section 1, Article II of the Ohio Constitution, the people of Ohio "reserve the power * * * independent of the General Assembly to propose amendments to the Constitution, and to adopt or reject the same at the polls."

Section 1a, Article II, provides that where a petition containing the signatures of ten percentum of the electors has been filed with the Secretary of State "proposing an amendment to the Constitution, the full text of which has been set forth in such petition, the Secretary of State shall submit for the approval or rejection of the electors, the proposed amendment, in the manner hereinafter provided, at the next succeeding regular or general election in any year occurring subsequent to ninety days after the filing of such petition."

Section 1g, Article II, prescribes in some detail the requirements of an initiative petition, requiring that it contain the "title, and text of * * * the * * * proposed amendment to the Constitution." It also provides that its provisions "shall be self-executing," but that "laws may be passed to facilitate their operation, but in no way limiting or restricting either such provisions or the powers herein reserved."

Here, the full text of the amendment as actually proposed on the part-petitions signed by the requisite ten percentum of the electorate was "set forth in such petition," as required by Section 1a, and such petition did "contain" the title and text of such proposal, as required by Section 1g.

The terms of such a proposed constitutional amendment are determined under the Constitution, not by the language of a petition submitted for preliminary examination to the Attorney General nor by the language of such a petition filed with the Secretary of State for approval as to form. Such terms are determined by the language of the actual proposed text of the amendment as contained in the part-petitions signed by the requisite number of electors.

For reasons hereinafter set forth we do not reach the question of whether R. C. 3519.01 conflicts with the Con-

stitution.[2] We do conclude, however, that any conflict in language or legal effect between any documents submitted or filed under the requirements of R. C. 3519.01 and the text of a proposed constitutional amendment as it actually appears on the initiative petition signed by the required number of electors is governed by such text. Although the proposal might have been considered to be that of the "committee," provided for in R. C. 3519.02, until such time as an initiative petition containing its full text has been signed by at least ten percentum of the electors, thereafter, under Article II, it becomes the proposal of the electors signing such petition and the specific terms of the proposal are determined by reference to its text.

The text of the part-petitions, the language of the newspaper publication, required by Section 1g, Article II, to be published for five consecutive weeks preceding the election, and the language of the ballot are consistent. None refers to any effective date, and as heretofore noted, by the

---

[2]In *State, ex rel. Tulley,* v. *Brown* (1972), 29 Ohio St. 2d 235, a majority of the court reached no conclusion upon that question, neither party having raised or argued that issue. Two members of this court, however, concluded that it was unconstitutional.

Justice Schneider concluded that R. C. 3519.01 "conflicts with the plain terms of Section 1g, Article II of the Ohio Constitution, which requires the initiative petition to contain the *title* and *text* of the proposed amendment and sanctions no such summary of that text."

Justice Brown stated:

"In spite of the fact that no party has raised any question as to the constitutionality of R. C. 3519.01, it strikes me as being unconstitutional on its face, since due process of law demands that the public be allowed to rely on the wording of the actual constitutional amendment, instead of a mere summary thereof. Such a summary restricts and circumvents, rather than facilitates, the people's important right to know what they are *actually* petitioning for. Section 1g, Article II of the Ohio Constitution, provides:

" 'Any initiative, supplementary or referendum petition may be presented in separate parts, but each part shall contain a *full and correct copy of the title and text* of the law. * * *' (Emphasis added.)"

In his dissenting opinion herein, however, Justice Brown now appears to have departed from his prior position that "the public be allowed to rely upon the wording of the actual constitutional amendment, instead of a mere summary thereof."

provisions of Section 1b, Article II, such amendment, if approved, would become effective on December 8, 1972.

In the chronology of events the last reference to an effective date of January 1, 1973, is that contained in the summary printed on the initiative petition. Assuming, but not deciding, that such a summary has any legal efficacy and that a conflict between the language of the summary and the language of the text, where both appear on the same initiative petition, would render such *petition* legally deficient, we are then met by the language of Section 1g, Article II, that "the petition * * * shall be presumed to be in all respects sufficient, unless not later than forty days before the election, it shall be otherwise proved. * * *" When this language is read *in pari materia* with the provision of this same constitutional provision that "no * * * amendment to the Constitution submitted to the electors by initiative * * * petition and receiving an affirmative majority of the votes cast thereon, shall be held unconstitutional or void on account of the insufficiency of the petition by which such submission of the same was procured," we think it clear that the 40-day provision is not limited to signatory insufficiency but extends to any defect of the petition of such character as would render it insufficient to require submission to a vote of the electorate as provided by Section 1a, Article II.

Essentially, the 40-day provision of Section 1g, Article II, is a constitutional limitation of action as to any claims that a proposed constitutional amendment should not be submitted to a vote of the electorate based on a claimed defect in the *petition*. Even if we assume that the erroneous statement as to the effective date contained in the summary printed on the petition would render such petition deficient, so as to authorize an order removing such issue from the ballot had an action asserting such a claim been filed more than 40 days before the election, the action herein was not filed within such time.

Much of the argument of relators concerned itself with the chaotic tax collection problems which would result from the adoption of such an amendment effective

December 8, 1972, and the alleged dire consequences of additional loss of tax revenue to the state. As a court we should not be required to say—but in the present posture of this case feel compelled to say—that our constitutional function in this dispute does not permit us to determine whether the proposed amendment, even with an effective date not originally contemplated by either its advocates or its opponents, is wise or unwise, or with whether an effective date of December 8, 1972, presents fiscal problems which would not have been present had the effective date been January 1, 1973. These arguments must be addressed to the electorate. Our judicial power is limited to determining the issue of whether, in view of the duty imposed upon him by Section 1a, Article II of the Ohio Constitution, the Secretary of State should be ordered to remove Issue No. 2 from the ballot at the election to be held November 7, 1972. For the reasons heretofore stated, we conclude that he should not.

*Writ denied.*

O'NEILL, C. J., SCHNEIDER, HERBERT, CORRIGAN and STERN, JJ., concur.

BROWN, J., dissenting. I am of the firm opinion that the proposed constitutional amendment, as stated, is a flagrant and irreconcilable erosion of the constitutional right of citizens to know the basic essentials concerning a proposed amendment to the state's Constitution.

Pivotal to this conclusion is the constitutional directive contained in Section 1g, Article II of the Ohio Constitution, which provides that any initiative, supplementary or referendum petition "shall contain a full and correct copy of the title, and text of the law, section or item thereof sought to be referred, or the proposed law or proposed amendment to the Constitution." The Constitution also requires that a true copy of any proposed constitutional amendment be published for five consecutive weeks preceding the election. Those mandates are unequivocally clear. This court has held, in paragraph three of the sylla-

bus of *State, ex rel. Greenlund,* v. *Fulton* (1919), 99 Ohio St. 168, that:

"The provisions of Section 1a *et seq.*, Article II of the Constitution, for the filing of petitions for proposed amendments to the Constitution, for copies, arguments and explanations thereof, and for preparation of ballots so as to permit an affirmative or negative vote upon each law, section of law or proposed law, or proposed amendment to the Constitution, are mandatory. A submission of a proposed amendment to the Constitution without substantial compliance with the provisions of the sections of the Constitution referred to is invalid."

Viewing the facts of the instant case, there are a panoply of omissions, inconsistencies and misrepresentations which will not only create an atmosphere of election confusion, but also completely negate the constitutional proscription embodied in Section 1g, Article II. The record is replete with points of omissions, inconsistencies and misrepresentations to wit:

1. The omission, based on the fact that the part-petitions, styled "initiative petition," prepared by the Secretary of State and issued by the committee for circulation for use in securing signatures necessary to propose a Constitutional Amendment, omitted the "EFFECTIVE DATE AND REPEAL" language.

2. The inconsistency, in that the part-petition document styled "intiative petition" was, in fact, summarily approved by the Attorney General with the "EFFECTIVE DATE AND REPEAL" language within the full text of the proposed constitutional amendment.

3. The omission, based on the fact that the Secretary of State, on August 24, 1972, in preparing and certifying the ballot for the general election to be held November 7, 1972, omitted the "EFFECTIVE DATE AND REPEAL" language.

4. The misrepresentations given to citizens via advertisements ordered by the Secretary of State on September 24, 1972, which, again, omitted the "EFFECTIVE DATE AND REPEAL" language.

5. The inconsistencies and misrepresentations flowing from the fact that since the inception of the proposed amendment in January 1972 until the complaint in this action was filed on September 29, 1972, representations have been repeatedly made verbally, in the newspapers, and through other media that the proposed amendment would be effective January 1, 1973, and would not affect collection of income taxes due and owing for the year 1972.

6. The misrepresentation and inconsistency that the proposed amendment would not become effective until January 1, 1972, when, in fact, it would become effective December 8, 1972, in accordance with Section 1b, Article II of the Ohio Constitution.

These six points of omissions, inconsistencies and misrepresentations, represent a substantial prejudicial blow to the rights of Ohio citizens to reasonably know and understand the effect of the proposed constitutional amendment. But more than that, these errors create an insurmountable display of confusion for the citizens of the state. It is apparent, therefore, that Ohio electors will not be reasonably apprised in regard to the effect of this proposed amendment. In such a situation, this court should not permit a vote on a proposition where the electorate has been misled in a substantial way with regard to the effect of the proposition.

Moved by the inalienable right of Ohio citizens to have, at the very least, an unclouded and untainted picture concerning issues on the ballot, particularly in regard to proposed constitutional amendments, I must, in all earnestness, question the wisdom of my colleagues' reasoning in this case.

The majority relies heavily on the time limitation clause contained in Section 1g, Article II of the Constitution, *i. e.,* "the petition and signatures upon such petitions, so verified, shall be presumed to be in all respects sufficient, unless not later than forty days before the election, it shall be otherwise proved."

This time limiting clause of Section 1g, Article II, is

self-explanatory. However, it is of vital importance that this clause be read in conjunction with, and within, the total context of Section 1g.

The unquestionable characterization of Section 1g is *ballot truthfulness*. The central theme and the loud message of Section 1g is preparation of ballots in a manner which will leave little room for errors of interpretation by electors. This constitutional theme of ballot truthfulness is the uncontroverted essence, and, therefore, the substance, of Section 1g.

It is noted, emphatically, that clauses which limit the time during which a complaint can be filed must be strictly construed. Nevertheless the absoluteness of such a clause is, I think, open to judicial scrutiny.[3] Moreover, under the factual circumstances of this case, that is the 24-hour procedural filing error and the clear infringement of the constitutional mandate, *i. e.*, glaringly apparent inconsistencies, it is manifestly evident that the constitutional mandate overwhelmingly and conclusively overrides the 24-hour procedural misgiving.

Thus, the slight procedural error, although of important persuasion, is overshadowed by more tantamount concern involving the constituional right of prospective voters to have ballot truthfulness. Consequently, in weighing and balancing the equitable propositions of the technical aspects of the law and of the Ohio Constitution, it is crystal clear to me that the inconsistencies of the part-petitions, omission of ''EFFECTIVE DATE AND REPEAL'' language, and the misrepresentations given to the public concerning the advertising, far outweigh the 40-day provision of Section 1g, Article II of the Constitution.

I also believe that the only mandate of the Constitution is that there be substantial compliance with the constitutional initiative and referendum provisions. There is no question in my mind that there has been substantial compliance with those provisions. The complaint herein was filed on the 29th of September, 1972, 39 days before

---

[3]This argument does not give cognizance to those situations which involve complainants who have slept on their rights.

the election, only 24 hours after there would have been total compliance with such provision of the Constitution.

In *Thrailkill* v. *Smith* (1922), 106 Ohio St. 1, 11, the court said:

"Nothing contained in this opinion should be construed to lend encouragement to indirection or any effort to deceive or mislead the voters, and if this court should be convinced that the matter printed upon the ballot, or the arguments for and against distributed by the Secretary of State, would in fact mislead, or deceive, or defraud the voters, we would not hestitate to enjoin the submission. * * *"

Moreover, narrowing the scope of inquiry directly to the 366,036 initial signatories of the part-petition, which also omitted the "EFFECTIVE DATE AND REPEAL," those electors have been directly denied their right of reasonable knowledge.

In *Markus* v. *Bd. of Elections* (1970), 22 Ohio St. 2d 197, the court said, at page 203:

"A ballot statement drawn pursuant to a referendum petition is crucial to the integrity of the constitutional safeguard of referendum. It is only from the ballot statement that the ultimate deciders of the question can arrive at an efficacious and intelligent expression of opinion. The ballot must fairly and accurately present a statement of the question or issue to be decided in order to assure a free, intelligent and informative vote by the average citizen affected."

Buttressing this argument is the fact that the summary as required by R. C. 3519.01, is to *"properly advise those who are asked to either sign the petition or to support the amendment at the polls, of the character and purport of the amendments without the necessity of perusing them at length."* (Emphasis added.) *State, ex rel. Hubbell*, v. *Bettman* (1931), 124 Ohio St. 24.

Consequently, the omission of "EFFECTIVE DATE AND REPEAL" language is not only violative of Section 1g, Article II, but also of the principle pronounced in *State, ex rel Hubbell*, v. *Bettman, supra.*

Singular attention must be given to No. 6 of the

points concerning omissions, inconsistencies, and mis-representations, which involves the "EFFECTIVE DATE" of the proposed amendment. This factor takes on critical dimensions in light of the fact that the proposed amendment would prohibit the assessment of any state income tax liability from the actual effective date of December 8, 1972 to December 31, 1972.

Omission of the "EFFECTIVE DATE AND RE-PEAL" would necessitate invoking the provisions of Section 1b of Article II that:

"Any proposed law or amendment to the Constitution submitted to the electors as provided in 1a and 1b, if approved by a majority of the electors voting thereon, shall take effect thirty days after the election at which it was approved * * *."

Thus, the effective date is December 8, contrary to all advertisements given previously. It is significant to note also that the "EFFECTIVE DATE" cannot, unless by a vote of the electorate amending the Constitution, be changed.

This court has held, in paragraph one of the syllabus of *Euclid* v. *Heaton* (1968), 15 Ohio St. 2d 65:

"A provision in a joint resolution of the General Assembly of Ohio, submitting to the electors of the state a proposed amendment to the Constitution, that the same shall not go into effect until a time later than that fixed by Section 1 of Article XVI of the Constitution, is inoperative and void, unless the proposition to postpone the taking effect of such proposed amendment beyond the time named in the Constitution is also submitted to the electors of the state and adopted by a majority of those voting on the proposition."

In conclusion, the substance of this dissent is within the direct confines of proper fairness to electors to be apprised of the truth concerning proposed constitutional amendments. To do less would not only abridge a constitutionally protected right, but, equally important, deny electors the right to make a decision on the proposed amendment free of all omissions, inconsistencies and misrepresentations.